THE STATE OF OHIO, APPELLEE, *v.* LEWIS, APPELLANT.

[Cite as State v. Lewis (1970), 22 Ohio St. 2d 125.]

(No. 69-202—Decided May 13, 1970.)

126

*Mr. Henry E. Shaw, Jr.,* prosecuting attorney, and *Mr. R. Kenneth Kunkel,* for appellee.

*Messrs. Tyack, Scott & Colley* and *Mr. Paul Scott,* for appellant.

CORRIGAN, J. Six questions of law are asserted in this appeal in support of certain contentions of error in connection with the trial.

The first proposition of law set forth by appellant is that the warrantless seizure of his automobile, which was parked on a private parking lot one-half block from the place of his arrest, was not incident to his arrest and therefore violated his rights under the Fourth Amendment to the Constitution of the United States.

At appellant's trial, evidence was introduced to the effect that paint samples taken from the exterior of his car after it was seized were similar to paint samples found on the car of the deceased at the scene of the crime. Also, there was testimony that appellant's car was similar to one seen near the scene of the crime shortly after shots were heard in the vicinity.

Appellant contends that the trial court committed prejudicial error in overruling his motion to suppress the evidence in relation to the paint samples and photographs of the car.

It is appellant's position that the seizure in the instant case was not incident to the arrest because the seizure was not contemporaneous with the arrest. Appellant cites *Stoner* v. *California*, 376 U. S. 483, *Preston* v. *United States*, 376 U. S. 364, and *Chimel* v. *California*, 395 U. S. 752, 23 L. Ed. 2d 685.

*Stoner* v. *California, supra,* holds that "a search without a warrant can be justified as an incident to arrest only if substantially contemporaneous and confined to the immediate vicinity of arrest."

In *Chimel* v. *California, supra,* defendant's entire house was searched without a warrant immediately following his arrest on a burglary charge. The Supreme Court reversed the judgment of conviction on the ground that the scope of the search unreasonably extended beyond "* * * the area from within which he might have obtained either a weapon or something that could have been used as evidence against him."

Neither *Stoner* nor *Chimel* concerns search and seizure of an automobile. *Preston* v. *United States, supra,* however, does. In *Preston,* after the occupants of a car were arrested for vagrancy, the police officers had the car towed to a garage where it was subjected to a warrantless search. It was held that the evidence obtained in that search was inadmissible because the search was too remote in time or place to be treated as incidental to the arrest.

Subsequently, in *Cooper* v. *California*, 386 U. S. 58, the

Supreme Court upheld a warrantless search of an automobile occurring a week after the arrest where the car had been impounded as evidence under a statute providing for seizure and forfeiture of vehicles used in violation of state narcotic laws.

At the outset, we note that there is a distinction between the seizure and search of a car simply for discovery of evidence of a crime in which the use of the car is merely incidental, and the seizure and search of a car where it is claimed that the car itself was an integral element in the commission of the crime, *i. e.*, an *instrumentality* of the crime.

In the instant case, the investigating authorities had reasonable grounds to believe that the car had been used in furtherance of the commission of the crime; that because it was used to push the victim's car over the river embankment, it was an instrumentality of the crime. Therefore, paint samples were taken from the exterior of the car to compare with paint found on decedent's car.

In *People* v. *Teale*, 70 Cal. 2d 497, 450 P. 2d 564, the Supreme Court of California upheld the warrantless scientific examination of an automobile which was "undertaken 10 days after defendant's apprehension and at a place far removed from the scene of his arrest."

In the course of the opinion, at page 507, the court said:

"We have concluded that in resolving the question of the legality of the scientific examination of Mrs. Chapman's automobile and of the admissibility of the criminalist's testimony in respect thereto, *Preston, Burke* [61 Cal. 2d 575], and the myriad of cases spawned by them are inapplicable since such scientific examination constituted neither a search nor a seizure within the meaning of the Fourth Amendment.

"As we have indicated above, two objects in defendant's possession and control were seized and taken from him when he was arrested. The first was a .32 caliber automatic pistol * * *. The second was *the automobile itself*, of which subsequent examination showed Billy Dean

Adcock to have been an occupant at the time he was shot. Clearly the seizure of both of these objects was incidental to the arrest of defendant. Both were seized as evidence connecting defendant with the alleged crimes. Both could have been introduced at trial as evidence. We can conceive of no reason why a distinction should be drawn between these two evidentiary objects on the basis that one is an automobile. Since it is plainly within the realm of police investigation to subject objects properly seized to scientific testing and examination * * * defendant cannot reasonably contend that such testing and examination was in derogation of his Fourth Amendment rights, and that evidence obtained thereby was therefore inadmissible. * * *

"We do not consider that our conclusion on this point evolves from novel principles. In our recent case of *People* v. *Webb* (1967), 66 Cal. 2d 107, at footnote 3 on pages 123-124, we reviewed four cases, two from this state, and, concluding that they represented 'further qualification of the *Preston* rule,' went on to summarize their rationale as follows: 'The implication is that when the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures.' We today make explicit what we recognized by implication in *Webb*."

Subsequently, at page 511 in the opinion, the court summarized as follows:

"* * * When officers, incidental to a lawful arrest, seize an automobile or other object in the reasonable belief that such object *is itself evidence* of the commission of the crime for which such arrest is made, any subsequent examination of said object undertaken for the purpose of determining its evidentiary value does not constitute a 'search' within the meaning of the Fourth Amendment."

For other authorities supporting this principle, see *State* v. *McKnight*, 52 N. J. 35, 243 A. 2d 240; *State* v. *Hoy*, 199 Kan. 340, 430 P. 2d 275; *Johnson* v. *State*, 238 Md. 528, 209 A. 2d 765; *State* v. *McCoy*, 249 Ore. 160, 437 P. 2d 734;

*State* v. *Gibson* (Wash.), 459 P. 2d 22; and *State* v. *Warner* (Me.), 237 A. 2d 150.

We agree with the reasoning of the court in *Teale*, and conclude that the examination by the police of an automobile which is an instrumentality of a crime, for evidence in connection with the crime in which the automobile was used, is not an unlawful search and seizure, even though the examination is conducted at a time and place remote from the time and place of the arrest of the owner and seizure of the automobile.

Since the seized car was an instrumentality used in the crime, the authorities had as much right to examine it as they would to examine a weapon claimed to have been used in the commission of a crime.

The second proposition of law advanced by appellant is that pretrial publicity concerning an alleged second wife of appellant and the failure of the state to make known a witness favorable to him denied him a fair trial.

Since the question as to the failure of the state to make known the witness is also related to appellant's sixth proposition of law, we will confine our discussion here to the pretrial publicity question and consider the other question in conjunction with the sixth proposition of law.

Appellant states that there was "a large amount of newspaper coverage as to the allegation that the defendant was married to two women at the same time" and that the state subpoenaed the alleged second wife separately from its other witnesses, thereby tending to magnify that publicity.

The alleged second wife was not called as a witness, and appellant contends that the sole purpose of subpoenaing her was to brand the defendant as a bigamist and damage his credibility.

In reply to that contention, the state asserts that the witness was subpoenaed in the belief that her testimony might have been valuable in relation to proof of appellant's financial difficulties upon which the state relied to establish motive for the crime.

While appellant cites *Sheppard* v. *Maxwell*, 384 U. S. 333, he does not specifically show that the atmosphere at the trial was so affected by the claimed pretrial publicity as to have deprived him of a fair trial. Nor does the record show any defense motion for a change of venue, and there was no effort on the jury *voir dire* to show that pretrial publicity had created a climate wherein defendant could not receive a fair trial. There is no claim that the trial itself was not conducted with decorum and impartially.

The trial court instructed the jury that it was not to "read, view, or listen to any report in the newspaper, radio, or television on the subject of this trial," and appellant points to no specific instances where a juror was subjected to the publicity complained of.

Therefore, we are of the opinion that appellant's claim of denial of fair trial due to pretrial publicity is without merit.

The third proposition of law brought forward by appellant is that the trial court erred in permitting a witness to testify as to the contents of a telephone conversation between the witness and an unknown third party. It is claimed that this resulted in deprivation of appellant's right of confrontation and cross-examination.

This claimed error arose from the testimony of Mrs. Jack Smith, wife of the prospective purchaser of appellant's business. She testified that on the morning of the homicide she received a telephone call "around ten minutes" after her husband left the house "between 9:15 and 9:30."

On direct examination, Mrs. Smith was asked to "repeat what was said to you by the person making the call."

She responded: "He said, 'This is Mr. Radcliffe' or else, 'this is Radcliffe,' one or other.

"He said, 'I went over the books last night and this morning. Everything is in A-1 shape' or, 'condition. I am going out of town, and I won't be back until Tuesday.' "

Mrs. Smith was cross-examined as follows:

"Mrs. Smith, you indicated that this telephone call

that you did receive was a person that purportedly stated his name was Radcliffe?

"Yes.

"* * *

"Well, did you ever hear Mr. Ralcliffe's voice on the telephone before?

"Many times.

"You are under oath. Are you saying to this court and jury that it wasn't Paul Radcliffe?

"No, it wasn't."

Appellant argues that this evidence was introduced for the purpose of showing that Radcliffe was dead at the time the call was received and to have it inferred that appellant made the call.

The basis of appellant's objection to this testimony is that the conversation was hearsay.

It is the state's position that the evidence was not hearsay because "it was not offered for the truth or falsity of the matter asserted in the phone call." In other words, the state, in effect, contends that the testimony was not offered to prove the condition of the books (the matter asserted by the caller) but only to show that the call was in fact received and therefore that the testimony did not offend the hearsay rule.

In VI Wigmore on Evidence (3 Ed.), 177, Section 1766, the author states:

"The theory of the hearsay rule is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted*, the hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the hearsay rule.

"*" * *

"The prohibition of the hearsay rule, then, *does not apply to all words or utterances merely as such.* If this fundamental principle is clearly realized, its application is a comparatively simple matter. The hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted.*

"* * *

"What here remains, then, is to distinguish and mark off the various classes of utterances which legally pass the gauntlet of the hearsay rule because it does not apply to them. The classes of utterances thus exempt may be grouped under three heads:

"1. Utterances material to the case as a *part of the issue;*

"2. Utterances accompanying an *ambiguous or equivocal act,* itself *material,* and serving to complete the act and give it definite legal significance; *i. e. verbal parts of an act;*

"3. Utterances used *circumstantially,* as giving rise to indirect inferences, but not as assertions to prove the matter asserted."

Under Wigmore's analysis, the testimony in question was admissible even though the utterances were, as appellant claims, used to provide indirect inferences that the call was made by appellant for the reason that the evidence was not offered as an assertion "to prove the matter asserted."

Under an annotation, Telephone Calls, Admissibility, 13 A. L. R. 2d 1411, it is stated, at page 1412:

"In cases in which the fact that a telephone call was made or received becomes a relevant one by reason of its bearing upon a material issue, the fact may become admissible in evidence as an independently relevant one irrespective of the substance or narration involved, or the truth or falsity thereof."

Here, the witness was not testifying for the purpose of establishing the content of the telephone conversation but

only to establish that the call was made. In such case, there is no denial of the right of confrontation of the witness.

Upon consideration of the foregoing, we are of the opinion that the testimony in respect to the telephone call was admissible and that the trial court did not err in permitting its being received in evidence.

In his fourth proposition of law, appellant states that the direct examination of a defense witness who was called to rebut the prior testimony of a state witness was improperly limited.

The state had earlier elicited from a state witness testimony to the effect that on the evening of the murder she and appellant's daughter had been near appellant's pick-up truck which was parked at the Shawnee Hills Swim Club, which appellant owned, and there observed on the seat of the truck a shotgun and a box with ''Super X'' marked on it. (The Super X shells were allegedly the type used in Radcliffe's slaying.)

This witness testified on Friday and the state rested its case thereafter. To rebut that testimony, appellant, on Friday afternoon, called the 14-year-old daughter of appellant. However, the daughter admitted that, at that time, she had no independent recollection of the events testified to by the state's witness. In attempting to elicit responses in relation to that testimony appellant's counsel tried to lead the witness, and objections were sustained to those leading questions. However, in answer to the question, ''Have you ever seen a shotgun?'' the witness replied, ''No sir,'' without objection being made.

On the following Monday when the trial was resumed, appellant's counsel was able to elicit from the daughter testimony directly rebutting the testimony of the state's witness, after preliminary questioning in respect to her examining of her diary and other items which refreshed her memory as to the events occurring in July.

Despite the fact that appellant was ultimately able to rebut the state's testimony by the direct examination of

his witness, appellant contends that the later testimony bore the "stigma of 'weekend coaching.'"

In view of the fact that on the initial examination of appellant's daughter she testified without objection that she had not seen a shotgun, it is apparent that appellant's purpose in examining the witness was served in that initial examination notwithstanding the limitations placed on that examination by the court's sustaining of objections to the leading questions of counsel.

The trial court properly sustained the objections to the leading questions, and we perceive no prejudice to appellant despite appellant's claim that the subsequent testimony of the witness was weakened because of the appearance of having been influenced by "weekend coaching."

We note that these events were induced by appellant. He chose to call the witness at a time when a weekend recess was imminent. Certainly the difficulty experienced from this timing and examination of the witness cannot be attributed to the state.

The fifth proposition of law presented by appellant relates to testimony admitted at the trial which the trial court, at the close of the evidence, withdrew from the consideration of the jury.

The testimony in question was by one Charles Huff who searched the area of the crime nearly three months after its commission and by use of a metal detecting device found three casings of Super X shotgun shells on a trailer inside the abandoned building located there.

In respect to that testimony, the trial court instructed the jury as follows:

"I would like to say * * * that there has been a motion which has been sustained, that the testimony of Mr. Huff, Charles Huff, by name, is withdrawn from your consideration, and you are instructed that you are not to consider it in your deliberations, in any way, shape or form."

Appellant contends that this testimony served to bind together other evidence about the use of Super X shells in the murder and that the instruction to disregard that testi-

mony was insufficient to overcome the damage resulting from its admission.

In addition to the stricken testimony, there was evidence by the state that shotgun shell waddings found at the scene immediately after the murder were from 16-gauge Super X shells, that a witness saw a shotgun and a box marked "Super X" in appellant's truck and that appellant owned a 16-gauge shotgun.

Thus, the stricken testimony was not as essential as appellant contends and was not required to tie together the other evidence in connection with the shells used in the homicide.

In 4 Ohio Jurisprudence 2d, 139, Appellate Review, Section 905, the following statement is found:

"In criminal cases where the trial court improperly overrules the objection of the defendant to testimony offered by the state, the judgment against him will not be reversed for such erroneous ruling, when the court, on motion of the defendant, excluded all the testimony so given from the consideration of the jury, and instructed them that it must be wholly disregarded, unless it is manifest that the hearing of the evidence was prejudicial to the rights of the defendant, or that the jury disregarded the instructions of the court. * * * "

We are of the opinion that even if, as appellant contends, the jury was not able to follow the court's instruction to disregard the evidence complained of, appellant was not prejudiced thereby as there was ample evidence on the issue of the shells used in the homicide and the stricken evidence was not essential to the state's case but only cumulative.

The final proposition of law posed by appellant relates to the trial court's failure to grant a new trial on the basis of newly discovered evidence.

We will consider this issue along with appellant's claim under his second proposition of law that the failure of the state to make known a witness favorable to him denied him a fair trial, since both claims relate to statements of the same person, one Harrison Berlin.

Appellant has attached to his brief a copy of statements taken of Harrison Berlin subsequent to the trial in which he stated that on or about May 19, 1967, at a business meeting with Radcliffe the latter told him that while he was appraising a building somewhere in the Delaware area a man had threatened him with a shotgun. Harrison Berlin indicated that he volunteered this information to detective Sam Powers of the Franklin County Sheriff's office on the Saturday following Radcliffe's death.

Appellant states that Sam Powers and Sgt. Lavery of the Delaware County Sheriff's office worked together on the case and that the state had knowledge of Harrison Berlin's statement made to Powers and did not disclose it to the court or appellant.

Appellant asserts that the state wrongfully withheld that evidence and the trial court should have granted a new trial on grounds of newly discovered evidence in respect to that same evidence.

In response to those claims, appellee has attached to its brief an excerpt from a deposition taken of Sgt. Lavery and an affidavit of Lavery, both of which contain statements by Lavery to the effect that prior to trial he did not know the name of the person who told Powers of the incident of May 1967.

In addition, Lavery asserted under oath that on December 19, 1967, he had a conversation with appellant's counsel in which he related to him "that he had heard rumors to the effect that the deceased, Paul Radcliffe, had been threatened with a shotgun in May, 1967, and that one, Roger Berlin, was in some way connected with or the source of said rumors," that his source of this information was Sam Powers of the Franklin County Sheriff's office, and that prior to the trial Lavery had never seen, met or conversed with either Roger Berlin or Harrison Berlin.

Appellant did present Roger Berlin, Harrison's brother, as a witness at the trial but was not able to elicit any knowledge on his part of the May incident referred to in Harrison Berlin's statement to Sam Powers.

It appears from the foregoing that appellant's coun-

sel, prior to trial, had as much information in respect to the May incident as did the state.

Thus, there is no worth to the contention that the state withheld evidence from the court or appellant.

Furthermore, appellant could have contacted Powers directly and inquired of the incident and thereby learned from him the name of Harrison Berlin.

The requisites for granting a new trial on grounds of newly discovered evidence were set forth in the syllabus of *State* v. *Petro,* 148 Ohio St. 505, as follows:

"To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

We do not believe that the grounds advanced by appellant in support of his motion for new trial are sufficient to satisfy the requirements enumerated in *Petro.* Therefore, the trial court did not err in overruling the motion for new trial.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., LEACH and STEPHENSON, JJ., concur.*

SCHNEIDER, and HERBERT, JJ., concur in paragraph one of the syllabus and in the judgment.

Even though the telephone conversation may have been admitted for reasons other than to establish the truth

---

*CHIEF JUSTICE TAFT participated in this case which was, however, decided after his death.

of its content, we fail to see the relevance of the fact that the call was made. However, in reviewing the entire record, we find the erroneous admission of this evidence to be non-prejudicial. See *Chapman* v. *California* (1967), 386 U. S. 18.

LEACH, J., of the Tenth Appellate District, sitting for MATTHIAS, J.

STEPHENSON, J., of the Fourth Appellate District, sitting for DUNCAN, J.